No. 12,120.

MRS. MARY BERWICK, WIFE OF JAMES D. CAPRON, VS. A. G. FRERE, SHERIFF, ET AL.

The certificate of the judge authorizing a married woman to borrow money and mortgage her property for her separate use and benefit shifts the burden of proof as to the character of the engagment from the creditor to the wife.

Berwick, Wife, vs. Sheriff et al.

The mere fact that a married woman has been authorized to borrow a fixed amount does not necessarily bind her if she subsequently undertakes to bind herself for that amount.

Where, on the face of an act of mortgage by the wife, knowledge was brought home to the mortgagee that the money about to be borrowed was intended to be used for the purposes of cultivating a plantation carried on by the husband for the benefit of the community, the wife will not be bound.

APPEAL from the Seventeenth Judicial District Court for the Parish of St. Mary. *Allen, J.*

D. *Caffery & Son* for Plaintiff, Appellant:

One who takes a mortgage from a married woman, knowing that the money loaned will enure to the benefit of the husband, or with good ground to believe that it will, has no valid claim against the wife, even though the mortgage was granted under the judicial authorization provided for in Arts. 126, 127 and 128 of the Civil Code. C. C., Art. 2398; Chaffe vs. Watts, 37 An. 333; Gibson vs. Hitchcock, 37 An. 209; Barthe vs. Kasa, 30 An. 940; Claverie vs. Gerodias, 30 An. 292.

The ownership of a plantation in indivision by a husband and wife, and the joint cultivation thereof by them, implies and necessitates the existence between them of a partnership, or some other contractual relation not permitted by law. Smith vs. Wilson, 10 An. 255; Benton vs. Roberts, 4 An. 216; Valensin vs. Valensin, 28 Fed. Rep. 599; Vaiden vs. Hawkins, 6 Sou. Rep. 227; Burgess vs. Badger, 12 West, 810; Dame vs. Kempster, 6 N. Eng. 93; Bank vs. Altheimer, 8 West, 562; Domat, Part 1, Book II, Tit. V, Sec. 2, Art. 1488; Toullier, Droit Civil, Book 7, Sec. 155, p. 91; Merlin Repertoire, Tome 6, p. 86, *verbo* Indivis.

A creditor who knows of the joint ownership and joint cultivation of the spouses is bound to know the legal status of such joint ownership and cultivation. *Ignorantia legis neminem excusat.* C. C., Art. 2285.

A mortgage taken by a creditor aware of a state of facts from which the law would deduce non-liability of the wife, is not protected by the certificate granted under the Act of 1855; *a fortiori*, must such protection be denied where the wife produces direct

evidence assailing the *bona fides* of the creditor, and showing that he regarded the husband as his debtor.

When a wife is authorized by a judge, under the Act of 1885, to mortgage her separate property for a certain sum, for a certain purpose, and for a loan of a certain character, and she thereupon executes a mortgage for a different sum, for a purpose in addition to the one recited in the certificate, and for a loan of a different character than that authorized, whoever endeavors to enforce the mortgage must prove *aliunde* that the debt enured to the separate benefit of the wife. Conrad vs. LeBlanc, 29. An. 123.

The certificate of the judge is authority for both the security and the contract; and if the wife is directed to mortgage her property and to pledge the crop thereon for the purpose of securing advances on a crop to be made on the property, and the pledge of the crop is disregarded, and the property alone is encumbered for the whole amount of the loan, the certificate has been violated in that there was an injurious variance between the security allowed and that given. C. C., Art. 128.

There can be no valid sale, either directly or indirectly, and either with or without a consideration, from a wife to a husband. C. C., Arts. 1790 and 2446.

Where a person avowedly interposed takes title to a wife's property, and on the same day, before the same notary and in the presence of the same witnesses, immediately sells same to her husband, taking the notes of the husband to represent the price, the confessed object of the transfer being to give an extension of time on a mortgage previously affecting the wife's property, the whole transaction must be considered as one between wife and husband, and is, therefore, null. Parnell vs. Petrovic, 14 An. 601; Vicknair vs. Trosclair, 45 An. 373; Layman vs. Vicknair, 47 An. 679.

Any third person is placed on his guard by records showing that the wife's property had passed from her into the immediate possession of her husband; and much more is a person who actively procured the transaction held chargeable with the equities. Layman vs. Vicknair, 47 An. 679.

Mortgages are not negotiable, and the equities are always pleadable against a third holder who has not been deceived into purchas-

ing by the apparent straightness of the records. Layman vs. Vicknair, 47 An. 679.

One who buys without warranty gets no more than a mere quit-claim, an equitable right, which is not bettered or strengthened by the circumstance that one who buys with such a title is a third holder. Eastman vs. Beller, 3 R. 253; 11 R. 441; 17 La. 403; 20 An. 250.

An administrator can not, without an order of court, transfer negotiable assets belonging to the succession represented by him; still less can he divest the succession of title by a private agreement to sell, in the absence of the fixing or payment of the price and without a delivery of the thing agreed to be sold. Nicholson vs. Chapman, 1 An. 222; Burbank vs. Payne, 17 An. 15.

*L. F. Suthon* for W. J. Suthon, Defendant, Appellee.

*E. Howard McCaleb* for Mrs. M. G. T. Stemple, Guardian, Defendant, Appellee:

Where a married woman borrows money, and is properly authorized by the judge to do so under Arts. 126, 127 and 128 of the Civil Code, she is absolutely bound in the absence of proof of: (1) Fraud or marital coercion, concurred in by or known to the creditor. Gibson vs. Hitchcock, 37 An. 209. (2) When the loan was, to the creditor's knowledge, for the benefit of the husband or to secure his debt. 30 An. 940, 291; 31 An. 734; 26 An. 737.

In the absence of such guilty knowledge, on the creditor's part, the judge's certificate is a complete protection to him. 32 An. 1103; 28 An. 232, 494.

To destroy the legal effect of the judge's certificate, "the most positive and satisfactory proof" is required. Blake vs. Nelson, 29 An. 249.

Evidence of the loose confession of a deceased person has little or no effect, particularly when contrary to rights shown by written evidence, or when other evidence can be procured. 10 L. 355; 6 An. 763; 2 R. 299; 7 R. 111, 146; 8 An. 277; 10 An. 279; 14 An. 274; 12 An. 401.

If the original mortgage granted by a married woman is valid and legal, a subsequent transfer to the creditor of the property mortgaged, in satisfaction of the mortgage debt, is likewise

valid and legal, when the consideration is adequate. The inter-
position of a person to receive title for the creditor does not
affect the validity of such a transfer.   Lester vs. Sheriff, 46 An.
340.

The consideration is adequate when it exceeds the assessed value of
the property on the assessment roll, which, after the approval
of the police jury, as a board of reviewers, has a *quasi*-judicial
character.   Railroad Company vs. Sheriff, 38 An. 760.

The good faith of a money lender is to be tested by the public rec-
ords alone.   " No other notice can prove knowledge " as to the
ownership of property.   The rule applies to married women.
Boyer vs. Sheriff, 40 An. 660; Broussard vs. Broussard, 45 An.
1085.

If the condition of the property is such as to invoke inquiry, then
where the public records disclose no equities, in the case of
married women, " an affirmative showing may be required
against an attack made by the wife."   If such be the case here,
such affirmative showing has been made, and a valid considera-
tion to the wife has been proven.   Layman vs. Vicknair, 46 An.
679.

Argued and submitted May 20, 1896.
Opinion handed down June 23, 1896.
Rehearing refused January 4, 1897.

### STATEMENT.

On the 4th of February, 1890, Mrs. Mary Berwick, wife of James
D. Capron, aided, authorized and assisted by her husband, presented
a petition to the judge of the Nineteenth Judicial District Court for
the parish of St. Mary, in which she averred that she was the owner
in her own right as her separate paraphernal property of the undi-
vided half of a certain plantation in that parish, which she described.
That she was administering the same for her benefit and account
outside of the community between herself and her husband; that
she was engaged in the cultivation and administration of same as a
sugar plantation, and was in need of funds for the proper and profit-
able cultivation and working of the same; that she had applied to
Mr. D. C. McCan, of the city of New Orleans, for funds for the pur-

poses aforesaid, and the said D. C. McCan agreed to advance her the sum of ten thousand dollars as it might be required during the current year 1890, in order to enable her to procure the necessary supplies and pay the necessary expenses of working, cultivating, harvesting and marketing the crops of cane, corn and other produce to be grown and cultivated on said plantation; that the said D. C. McCan required from her a special mortgage on her aforesaid property, and a factor's lien and privilege on all the crops and products of the aforesaid property for the current year 1890, to secure him in his aforesaid advances not exceeding ten thousand dollars. · Wherefore she prayed the said judge to authorize her to make the aforesaid loan for the purposes aforesaid, and to secure same by a special mortgage on her aforesaid property, and also a lien and privilege on all the crops and products grown and produced on same during the current year 1890. The District Judge rendered the following order upon this petition:

"Having examined Mrs. Mary D. Capron separate and apart from her husband, James D. Capron, and being satisfied from such examination that the sum of money which she contemplates borrowing from D. C. McCan, as stated in the foregoing petition, is for her own use and benefit, and that of her separate estate, and not for the benefit of her said husband, or the payment of his debts, nor those of the community heretofore existing between said parties, I hereby authorize the said Mrs. Mary D. Capron to borrow the said sum of ten thousand dollars from the said D. C. McCan, and to secure the same by a special mortgage on her paraphernal property, and also by a lien, privilege and pledge on the crops to be grown on her said property during the year 1890. Granted in chambers, this 4th day of February, 1890."

On the 7th of February, 1890, a notarial act was executed before Andrew Hero, notary, to which James D. Capron and his wife and D. C. McCan were parties. In this act Mrs. Capron appeared as acting under the authority of her husband and of the certificate or order of the District Judge just copied. The act recited that she acknowledged herself indebted to McCan in the sum of ten thousand dollars, borrowed money had of him under and by virtue of the said certificate; that in settlement and as evidence of said indebtedness, she had furnished her two promissory notes of five thousand dollars each, drawn by her to her own order and by her endorsed, counter-

Berwick, Wife, vs. Sheriff et al.

signed by her husband, payable one and two years after date, with interest at the rate of eight per cent. per annum from maturity until paid; that interest for the first year had been paid in advance, and that the interest for the second year was represented by a promissory note also then executed by Mrs. Capron of like tenor for four hundred dollars, payable two years after date.

That in order to secure payment of the said notes Mrs. Capron specially mortgaged in favor of McCan her undivided half interest in the property mentioned, cultivated as a sugar plantation. That in order to more fully secure the punctual payment of the said notes, James D. Capron specially mortgaged his undivided half of said property in favor of McCan—to the end and effect that the plantation and appurtenances in its entirety should be mortgaged as security for the payment of the notes. It was expressly declared in the act that it was agreed and understood by and between the parties to the act that the said mortgagee should have the exclusive right to apply the net proceeds of all products shipped and all payments of money made to him to the payment of any indebtedness which might (may) be then due or which might (may) hereafter become due to said mortgagee by said mortgagors, whether upon an open account or to the debt secured and intended to be secured by the act, according to the said mortgagee's view of the exigency of the case; that such application might (may) be made at such times and in such manner as said mortgagee might (may) elect; that no application of such proceeds of sales or money to the payment of any debt on open account which might be due to the said mortgagee by the said mortgagors should impair, lessen or prejudice the indebtedness evidenced by the notes and secured by the mortgage, and that said mortgagee should have the full and undisputed right to impute payment as he might determine to whatsoever debt might (may) be due him by said mortgagors. Production of the certificate of mortgages in the parish of St. Mary was waived. The certificate or order of the District Judge was annexed to the act.

On the 13th of April, 1893, by act before John J. Ward, notary public, James Capron sold his undivided half of the property mortgaged to Charles J. McMurdo in consideration of the price of nine thousand one hundred and twenty-four dollars. The act of sale recited that the purchaser was the holder and owner of four promissory notes, for the sum of two thousand dollars each, drawn by

Capron to his own order and by himself endorsed, bearing interest at the rate of eight per cent. per annum from January 1, 1890, until paid, said notes amounting, at the date of the sale, in principal and interest, to the sum of nine thousand one hundred and twenty-four dollars, and being the notes given by Capron to his vendor, Mrs. Allen, in payment of the property conveyed. That their payment was secured by special mortgage on the property sold, with vendor's privilege, and that the vendor had agreed to accept and receive said notes in settlement of said purchase price. The act declared that in full settlement of the purchase price the purchaser had surrendered and delivered the four aforesaid notes to the vendor, who acknowledged receipt of the same, declaring himself therewith fully satisfied and paid and granted the purchaser a full acquittance and discharge for the aforesaid price.

The notes having been produced and canceled, authorization was given to the recorder to cancel and erase the inscription of the mortgage securing the same.

On the same day, before the same notary, Mrs. James D. Capron sold her undivided half in the same property to Charles J. McMurdo for the price of ten thousand nine hundred and fifty-five dollars. The act recited that the purchaser was the holder and owner of two notes, of five thousand dollars each, drawn by Mrs. Capron to her own order and by her endorsed, countersigned by her husband, which notes, in principal and interest, at the date of sale, amounted to said sum of ten thousand nine hundred and fifty-five dollars; that said notes were those secured by the special mortgage on the property sold in favor of D. C. McCan by the act of February 17, 1890, before Hero, notary, and that the vendor had agreed to accept and receive said notes in settlement of the purchase price. The parties declared that said price had been settled and liquidated by the purchaser's surrendering and delivering to the vendor the said notes, "they having been canceled in the presence of the notary, the holder acknowledging payment of the same and granting Mrs. Capron full acquittance and discharge therefor." The notes having been canceled, authorization was given to the recorder to erase the inscription on the mortgage books of the mortgage securing the same.

On the same day the same notary, Charles J. McMurdo, sold the property in its entirety to James D. Capron (the act reciting that it

was the same property which the vendor had acquired that day from the purchaser Capron and from his wife by two acts passed before John J. Ward, notary) for the price of twenty thousand dollars, payable two thousand dollars in cash, three thousand payable in one year, four thousand payable in two years, five thousand payable in three years, and six thousand payable in four years, with interest on the entire credit portion payable annually; the credit portion being represented by promissory notes executed by Capron to his own order and by himself endorsed, secured by special mortgage on the property sold. The interest portion of the purchase price was represented by notes separate and distinct from those for the principal amount, and notes being also secured by special mortgage on the property sold. One of the interest notes was for the sum of fourteen hundred and forty dollars. The notes were all delivered to McMurdo.

On the 23d of June, 1894, by act before Ward, notary, Harry H. Hall, as executor of D. C. McCan, transferred with their accessory rights but without warranty or recourse back to Walter J. Suthon two of the notes executed by James D. Capron as representing the credit portion of the price of the sale made to him by McMurdo, with the agreement that the rights of Suthon as holder of the same would be subordinate to those of McCan as holder of the other notes.

Suthon, as holder of these two notes, having seized under an order of sale the entire property, was met by an injunction taken out by Mrs. Capron, and we are called on to pass upon the issues raised by the parties in that injunction.

There was judgment for defendants, and plaintiffs appealed.

----

The opinion of the court was delivered by

NICHOLLS, C. J. It is claimed on behalf of Suthon and the executor of McCan that Mrs. James D. Capron became indebted to McCan in the sum of ten thousand dollars and interest through a loan made to her on the seventh day of February, 1890, on the faith of the certificate or order of the District Judge of the court of her residence, authorizing her to contract said loan, and that said loan was legally secured under the same authorization by special mortgage on her undivided half of the plantation owned jointly between herself and husband, and cultivated as a sugar plantation; that she legally sold

14

her interest to McCan through McMurdo (acting on his behalf) in payment of her indebtedness; that her husband having sold his undivided half also to McMurdo (for McCan) the latter then becoming the owner of the entire property, sold the same to plaintiff's husband, the price being secured by mortgage; that said sale was legal, and that plaintiff, through her own sale to McCan, divested herself of all interest in the premises; that if the sale should be set aside McCan should be reinstated in his position, *quoad* Mrs. Capron and the property to the position which he occupied prior to her sale.

The property in question at the time of the loan made by McCan was as to one undivided half of the paraphernal property of the wife of James D. Capron. The other undivided half belonged to the husband, he having acquired it from his wife's sister. At the time of the loan the husband's half was struck by a special mortgage and vendor's privilege securing notes given by the purchaser to his vendor. The property had been cultivated for some years as a sugar plantation, and the wife had for several years, under the authorization of the judge, mortgaged her undivided half to different factors to assist in carrying on the place.

On February 7, 1890, D. C. McCan made the loan which has given rise to this litigation. On the face of the papers McCan appears to have loaned Mrs. Capron ten thousand dollars, for which he executed notes and secured the same by special mortgage on her undivided half of the property. On the face of the papers James D. Capron secured the whole amount by mortgage on his half.

It is urged that McCan is protected by the authorization of the judge to the wife from the attack she makes in this case.

The mere fact that a married woman has been authorized by the judge to contract a debt of ten thousand dollars does not necessarily conclusively bind her if she subsequently undertakes to bind herself for that amount. The certificate of the judge shifts the burden of proof as to the character of the engagement. An examination of the act of mortgage between McCan, James D. Capron and Mrs. Capron satisfies us that the act does not truly disclose the relations of the parties to it. We are of the opinion that on its face, knowledge was brought home to McCan that Capron and wife owned the plantation jointly in equal proportions; that the money about to be borrowed was intended to be used for the purpose of cultivating the plantation that year; that the lender knew that the

husband was really carrying on the whole place for and on behalf of the community.  The husband's half at that time, as we have said, was encumbered by a special mortgage.  It was important that whatever advances should be made should, if possible, be secured to their full extent by mortgage.  It was evidently supposed that under and through the wife's authorization the lender would be protected on her half of the property to the full amount which she was authorized to borrow, but if not, then by making the husband secure it in its entirety by a second mortgage on his own behalf, McCan would still occupy a safe position.  Matters were made to take that shape, but we think that the act bears intrinsic evidence that McCan was not dealing with James D. Capron really as a surety; that he was dealing with the husband as a principal, and that she was really mortgaging her property for her husband's debts.    (Moore vs. Stancel, 36 An. 824.)   Defendants say that McCan did not occupy the position of factor toward James D. Capron; that he was simply an " out and out" lender of money to Mrs. Capron, and that the mortgage was a " flat" mortgage.

If this be true what means that portion of the act in which it is declared that "it was expressly agreed and understood that McCan should have the exclusive right to apply the net proceeds of sale of all products shipped and all payments made to him to the payment of any indebtedness which may be due now, or which may hereafter become due to him by said 'mortgagors,' whether upon an 'open account' or to the debt secured and *intended to be secured* by these presents according to his view of the case; that such application might be made at such times and in such manner as he might elect; that no application of such proceeds of sales or money to the payment of an indebtedness on an open account which may at any time be due to him by the said 'mortgagors' shall impair, lessen or prejudice the indebtedness evidenced by notes and secured or *intended to be secured* by this instrument or the security herein and hereby provided for, and that said mortgagee shall have the full and undisputed right to impute payment as he may determine to whatsoever debt may be due by said 'mortgagors.'"   What " debts made by open account," what " debts due by mortgagors," are here referred to?   Certainly not any due BY HER.

It is very true that a husband may become a surety for his wife; (it has been so held), but we think the term of the mortgage act point

unmistakably to the fact that the form in which this act was drawn was resorted to simply as a means to enable the lender to get secured on the wife's property for debts of her husband. On the face of the papers the crop (*the means by which the District Court coutem-plated that any liability to be incurred under his certificate was to be paid*) was expressly authorized to be taken from her and applied to her husband's debts, either upon open account or otherwise, leaving her property utterly without protection.

What effect did the acts between McMurdo and her husband and between McMurdo and herself have upon the situation? It is conceded that McMurdo and McCan are to be taken and considered as one and the same person.

We think that the two acts of sale (those to McMurdo and that of McMurdo to Capron, the husband) are to be read together and as forming one continuous transaction. Were the acts of sale from Mrs. Capron to McMurdo, and from McMurdo to James D. Capron, intended really as sales, or were they merely resorted to in order to place the matter in more satisfactory form than they had been in before? What was the object and what the motive of these acts, and what did they rest on? At that time McCan held the notes secured by special mortgage and vendor's privilege on Capron's half of the property. It was thought best that the property should be made to stand in its entirety in the name of Capron, the husband, and that the indebtedness should appear what it really was, an indebtedness due by himself, but the apparent mortgage to McCan, indebtedness of the wife was made use of as an instrumentality by which to shift ownership from herself to her husband and mask the character of the wife's connection with the debt.

We are of the opinion that the sale from Mrs. Capron to McMurdo can not stand, there being no legal consideration for the same, and that sale being the basis of the sale to Capron from McMurdo of Mrs. Capron's half of the property, the sale of that undivided half to Capron falls also.

We do not think that the plaintiff, Walter J. Suthon, occupies a better position than does the succession of McCan. We think his knowledge of the situation (although he may have drawn erroneous conclusions from it) effectually prevents his pleading that the equities have been cut off in his favor.

We are of the opinion that the judgment appealed from is erroneous.

It is ordered, adjudged and decreed that the judgment appealed from be and the same is hereby annulled, avoided and reversed; and it is now ordered, adjudged and decreed that Mrs. Mary Berwick, wife of James D. Capron, be and she is recognized and declared to be the owner of the undivided half of the plantation seized herein and described in the pleadings, and she is restored to the possession and enjoyment of the same, free from the encumbrances placed upon it by her husband, James D. Capron, in favor of D. C. McCan or Charles McMurdo, the said mortgage being declared to be null, void and of no effect as against said undivided half of said property.

It is also ordered, adjudged and decreed that the sale of the undivided half of said property, made on the 13th of April, 1893, by act before John J. Ward, notary public, by Mrs. Mary Berwick, wife of James D. Capron, to Charles J. McMurdo, and the sale made by Charles J. McMurdo on the same day, before the same notary, to James D. Capron, of the undivided half of said property herein adjudged to be the property of said Mrs. Mary Berwick, wife of James D. Capron, be and the same are hereby decreed null, void and of no effect.

It is further ordered that the injunction herein issued be and the same is reinstated and the same is now perpetuated.

Rehearing refused January 4, 1897.

---

### CONCURRING OPINION.

WATKINS, J.—The plaintiff, a married woman under coverture, enjoins the seizure and sale of one undivided half interest in the Berwick Home plantation in the parish of St. Mary, of which she claims the ownership in her own paraphernal right, by inheritance from her father, on the averment that her title is attempted to be divested by means of certain fraudulent and illegal proceedings in the foreclosure of a mortgage and sale thereof, by Walter J. Suthon, plaintiff in the suit of Walter J. Suthon vs. James D. Capron, her husband.

The two grounds of nullity on which plaintiff relies are, *first*, that

the act of mortgage to which her signature was affixed, bearing date February 7, 1890, purporting to secure a loan of ten thousand dollars in money by D. C. McCan, was, in reality, a security for the personal indebtedness of her husband, then existing, and of the matrimonial community between herself and husband, to the extent of at least three thousand dollars, and for the security of the further and remaining balance of seven thousand dollars which was contracted and agreed to be thereafter employed by her husband, in the cultivation of a crop of sugar upon said plantation and land under his administration and control—said husband being the owner of the other undivided half interest—in contravention of Art. 2398 of the Revised Civil Code; second, that the acts of sale from her to Charles J. McMurdo, a party interposed for D. C. McCan, on the 13th of April, 1893, in purported liquidation and settlement of the aforesaid mortgage note of ten thousand dollars, and that of same date, by said McMurdo representing McCan, to her husband, James D. Capron, upon terms of credit, truly evidence an attempted sale from herself to her husband, in violation of the express prohibition of Art. 2446 of the Revised Civil Code—and that it was accomplished through the representations and at the request of the defendants, D. C. McCan and Walter J. Suthon, for the express purpose of giving to the original transaction a new shape, and relieving it of apparently illegal features, with the definite object of making the new notes a better security than the old ones were.

In support of said grounds of nullity, she avers that she was induced to sign said acts, through the exercise of marital influence on the part of her husband, believing them to be for his interest and advantage.

On the part of the defendants, the response seems to be: First, a denial, that, in point of fact, the ten thousand dollar notes were given for the purposes stated by the plaintiff, coupled with the averment that it was for money loaned to her; second, that if said note was really given for the purpose stated, same was not to the knowledge, or with the consent of McCan, and that she having availed herself of the certificate of the judge authorizing her to borrow money, on the faith of which he acted in making the loan, has placed upon her the burden of making proof of her allegations; and third, that Suthon actually and really acquired the said notes on which the executory proceedings are based before their maturity, and is

protected thereby against secret equities, or latent ambiguities between the original parties.

On this statement, the first piece of evidence to be analyzed is the act of mortgage and the accompanying certificate of the judge; and therefrom we find the following facts:

The certificate of the judge is prefaced by a petition on the part of the plaintiff, as a proposed mortgagor, from which we make the following extracts, viz.:

That she is the owner in her own right of an "undivided half of that certain tract of land, or sugar plantation, known as the Berwick Home place," and that "she is administering the same for her benefit and account, outside of the community between her and her husband; and that she is engaged in the cultivation and administration of same as a sugar plantation, and in need of funds for the proper and profitable cultivation and working same. She represents that she has applied to Mr. ———, of the city of New Orleans, for funds for the purposes aforesaid, and the said ——— has agreed to advance her the sum of ten thousand dollars, as it may be required during this current year 1890, in order to procure the necessary supplies and pay the necessary expenses of working, cultivating, harvesting and marketing the crops of cane, corn and other products to be grown and cultivated on said plantation. She says that ——— requires of her a special mortgage on her aforesaid property, and a factor's lien and privilege on all the crops and products of the aforesaid property this current year 1890, to secure him in the aforesaid advances, not exceeding ten thousand dollars."

Wherefore she prays for the authorization of the judge for the purposes aforesaid—that is, to borrow ten thousand dollars for her own individual use in the cultivation and harvesting of a crop of sugar on her paraphernal property, during the year 1890, "as it may be required;" the aforesaid loan to be secured "by a special mortgage on her aforesaid property, and also a lien and privilege on all the crops and products grown or produced thereon this current year 1890."

This petition is signed by

"MARY B. CAPRON."

"To authorize my wife.

"J. D. CAPRON."

To this is appended the Judge's certificate of authorization, viz.:

" Having examined Mary D. Capron separate and apart from her husband, James D. Capron, and being satisfied from such examination that the sum of money which she contemplates borrowing from D. C. McCan, as stated in the foregoing petition, is for her own use and benefit, and that of her separate estate, and not for the benefit of her said husband, or the payment of his debts, nor those of the community heretofore existing between the parties, I hereby authorize the said Mrs. Mary D. Capron to borrow the said sum of ten thousand dollars from the said D. C. McCan, and to secure the same by special mortgage on her paraphernal property, and, also, a lien, privilege and pledge on the crops to be grown on her said property during the year 1890.

" Granted in chambers this 4th day of February, 1890.

(Signed)                                " A. C. ALLEN,

" *Judge of the 19th Jud'l. Dist.*"

This certificate discloses that D. C. McCan was the person from whom Mrs. Capron contemplated obtaining the loan, and, consequently, his name should be read into the blanks left in the foregoing petition.

The foregoing certificate of examination and authorization exactly conform to the provisions of Revised Civil Code 127 and 128, and the latter declares that such " certificate, on presentation to the notary, shall be his authority for drawing an act of mortgage, or other act which may be required for the security of the debt contracted, and shall be annexed to the act, and when executed as herein prescribed, shall furnish full proof against her and her heirs, and be as binding in law and equity in all courts of this State, and have the same effect as if made by a *femme sole.*"

But the validity of the judge's certificate depends upon its conformity to the provisions of Art. 126, which declare that a married woman, " with the sanction of the judge, may borrow money or contract debts *for her separate benefit and advantage*, and to secure the same, grant mortgages or other securities affecting her separate estate, paraphernal or dotal; " and with those of Art. 127, which declare that " in carrying out the power to borrow money or contract debts, the wife *in order to bind herself*, or her paraphernal or dotal property, must * * * be examined at chambers by the judge * * * separate and apart from her husband

Berwick, Wife, vs. Sheriff et al.

touching the objects for which the money is to be borrowed or debt contracted, and if he shall ascertain either one or the other *are for her husband's debts, for his separate benefit or advantage, or for the benefit of his separate estate or of the community*, the said judge shall not give his sanction authorizing the wife to perform the acts, or incur the liabilities set forth in Art. 126."

As these articles constitute the measure of the *judge's authority and power* in granting the certificate, and the *sole authority of the notary for drawing the act* of mortgage security, the provisions thereof must be strictly pursued, on pain of nullity.

Examining the contemporaneous act of mortgage which was executed before Andrew Hero, notary, on the 7th of February, 1890, we find the following pertinent provisions viz. :

That Mrs. Mary Berwick, wife of James D. Capron, declared herself to be indebted to David C. McCan, "in the sum of ten thousand dollars borrowed money," and in settlement thereof she has executed and delivered to him her two promissory notes of five thousand dollars each, drawn to her own order and endorsed and countersigned by her husband, and payable at one and two years after date.

That in order to secure the payment of said notes, she mortgages and hypothecates unto and in favor of D. C. McCan, her aforesaid half interest in the aforesaid sugar plantation.

That in order to more fully secure the aforesaid notes, her husband, J. D. Capron, intervened in said act, and consented and agreed to mortgage and hypothecate his undivided one-half of said plantation and land, to the end and effect that the *whole* of said plantation should become mortgaged and hypothecated as security for the aforesaid loan of ten thousand dollars by McCan to his wife.

And said act contains the further stipulation, viz. :

"And it is expressly agreed and understood, by and between the parties hereto, that the said mortgagee shall have the *exclusive right* to apply the net *proceeds of sale of all products* shipped, and all *payments of money* made to him, *to the payment of any indebtedness which may be due now, or which may hereafter become due to said mortgagee by said mortgagors, whether upon an open account or to the debt secured and intended to be secured by these presents, according to said mortgagee's view of the exigency of the case;* that such application may be made at such times and in such manner as said mortgagee may elect; that no application of such proceeds of sale or money, to the pay-

ment of *any debt or open account which may at any time be due* to the said mortgagee by said mortgagors shall impair, lessen or prejudice the indebtedness evidenced by said notes, and secured or intended to be secured by this instrument, or the security herein and hereby provided therefor; and that said mortgagee shall have the full and undisputed right to impute payment as he may determine to whatever debt may be due him by said mortgagors."

The act contains a waiver of the production of a mortgage certificate, and same is signed by Mrs. Capron and her husband and D. C. McCan, in the presence of the notary and witnesses.

The conspicuous features of this act are that it secures the payment of two notes of five thousand dollars each for *borrowed money*, falling due at the expiration of *one and two years after the date of the act, without making any mention of the objects and purposes of the loan, or of the fact that same was for the use and benefit of her separate paraphernal property, or that same was intended for use in the cultivation of a crop of cane on her separate property under her administration*, as expressed in the judge's certificate.

And while it contains no pledge, lien or other security upon the crops of Mrs. Capron as mortgagor, as contemplated by the judge's certificate, it declares, with elaboration and especial care, that McCan, as mortgagee, shall have the *exclusive* right to apply the net *proceeds of the sale of all products shipped* and of *all payments of money made* to him, to the *payment of any indebtedness* to said mortgagee *by said mortgagors.* Or, in other words, it gave to McCan the exclusive right to impute the *entire proceeds of all crops* produced upon the plaintiff's undivided interest in the lands jointly owned by both of the mortgagors, Mr. and Mrs. Capron, to *any* debt of either of them, secured or unsecured, and to likewise impute all payments of money made by either of them.

It is manifest that the immediate effect of that stipulation was to enable the mortgagor to *absorb the crops and money of the wife in the liquidation and payment of the unsecured indebtedness of the husband;* whereas it was, in the contemplation of the wife in presenting her petition, and of the judge in signing the certificate, that the *money was borrowed for the purpose of producing a crop which should be pledged exclusively for the reimbursement of the loan, and secure the release of the mortgage given upon her paraphernal* property as security therefor.

It is of this stipulation of the act of mortgage that the plaintiff urges especial complaint, and it is for this that she claims that the judge's certificate of authorization constitutes no protection, but on the contrary shifts the burden of proof upon the mortgagor, to establish that the money inured to the benefit of her separate property, and was not employed in the payment of the debts of the husband or the community. And, indeed, it seems quite apparent that the property jointly owned by husband and wife in indivision, and, no doubt, jointly administered, being thus bound up and its revenues placed beyond the plaintiff's control, and at the exclusive option of the joint creditor of both husband and wife, would speedily result in the sacrifice of the latter's interest, for the very potent reason that the act to which she was thus made a party rendered her, by its plain provisions, utterly powerless to disencumber it of the mortgage.

Passing, however, from the recitals of the acts which operate full notice to the parties and to all the world, to the pleadings and evidence taken at the trial, we find the following state of facts applicable to the original transaction:

The averments of the plaintiff's petition are, that the "whole of the said plantation was cultivated by her husband for his own individual account, or for that of the community existing between them, and for no advantage or benefit of hers or of her paraphernal estate. That the planting operations of her said husband were unprofitable for the year 1889, and resulted in a loss to him of three thousand dollars, which sum was wholly due by her said husband, and not in any way by her. That, finding himself in debt, and in need of supplies for making his crop for the year 1890, her said husband applied to David McCan * * * for a loan of eighteen thousand dollars, of which ten thousand dollars was for the purpose of liquidating and settling said debt, and of cultivating on his own account the above described plantation, for which purpose said McCan well understood and knew said sum to be borrowed; * * * and that the said McCan knew that said sum was borrowed and used by her said husband on his own account, and that it was not borrowed or used for her account or that of her paraphernal property.

"That to secure said loan she was required by her said husband to sign in favor of said McCan a mortgage on her said property for ten thousand dollars, which mortgage was passed before Andrew Hero, notary public, on the 7th of February, 1890."

Petitioner further represents that said act was signed by her against her wishes, and solely because of the inducements of her said husband, and of the exercise of his marital influence and coercion; and that " in order to give an appearance of legality to said mortgage she was required by her said husband to obtain from the District Judge the certificate provided in Arts. 127, 128 and 129 of the Civil Code," etc.

" That said certificate directed that (her) property be mortgaged, *not as a sole* security for said sum of ten thousand dollars, but as *partial* security therefor, as, in addition to the mortgage on (her) said property she was directed to secure said sum by giving a lien, pledge and privilege on the crop to be grown on said plantation, so that the crop, as well as the real estate should be held for the payment of the said loan. That said crop was an important element of said security, as it was known to the judge, and all parties interested, that same would be valuable and would sell for enough to pay the said loan. That the terms of said certificate were not complied with, (she) not having been authorized in said certificate to mortgage her property alone, but was only authorized to grant a double security of mortgage and pledge upon the crop, so that the whole burden of the debt should not fall upon the said real estate; and the property having been mortgaged and no pledge retained upon the crop, her property became liable for the whole of said sum, whereas it was the plain intention of the judge that the crop should be answerable for the bulk, and perhaps the whole of said sum," etc.

Recurring to the aforesaid recitals and express stipulations of the act of mortgage, just the reverse of the judge's authorization appears; for not only was there no pledge of the crops stipulated therein, but, on the contrary, it contained the stipulation that the creditor and mortgagee should have the exclusive right to apply *any* proceeds of crops realized to *any* debt of either mortgagor, at his pleasure, thus unduly exposing and burthening the plaintiff's interest in the real estate, *exactly opposite* to the judge's intention, as plainly expressed in his certificate.

The answer of H. H. Hall, executor of David McCan, is a substantial verification of the recitals of the judge's certificate and an affirmation of the truthfulness of the act of mortgage.

That of J. D. Capron is that he acquired by purchase from Mrs. Louisa Allen, a sister of his wife, one undivided one-half interest in

the Maryland plantation which is herein involved, on the 13th of November, 1889, for the price of eight thousand dollars on terms of credit, exclusively, for which he executed four notes, secured by mortgage and vendor's lien, payable at future dates specified.

That, finding himself unable to pay same at maturity, " he applied to David C. McCan * * * for the sum of eighteen thousand dollars, of which eight thousand dollars was necessary for the satisfaction or purchase of said Allen notes; three thousand dollars of which was for the payment of his commission merchant of a deficit in his account * * * for the running expenses of (his) cultivation of said plantation for the year 1889; and seven thousand dollars of which was for respondent's cultivation of his crop on the said plantation for the year 1890, for which purpose (he) stated to McCan the said sum was to be used." That the said McCan agreed to loan (him) the amount required, and to purchase the Allen notes, and did so.  " That to secure the ten thousand dollars remaining after the purchase of the Allen notes (his) wife executed in favor of McCan a mortgage passed before A. Hero, notary public, on February 7, 1890.  That at the maturity of said ten thousand dollars notes * * * (he) was ready and able to pay same with the proceeds of the crop grown on the said plantation for the year 1890, but the said McCan consenting to their continuance for another year, they were not paid by him.  That his planting operations for the year 1891 and 1892 being unsuccessful, and he being again in need of money for the cultivation of the crops on said plantation, he applied to (the plaintiff) for a loan which * * * said Suthon refused to make, for the reason that he (Suthon) considered the McCan mortgage against his (Capron's) wife, or any other mortgage from her *under the condition of joint* ownership of the said plantation in (him) and his wife, and the necessary management thereof by him, as null and void.  But that said Suthon suggested that title to the whole property and plantation be put in respondent, and this was done by the transfer of April 13, 1893, before Ward, notary public; and that (he) being unable to obtain money from any other person was compelled to accede to said arrangement, which having been consummated, was satisfactory to said Suthon, who agreed to make advances, and did so."

It is admitted on the part of the defendants that the undivided half interest in the property which the plaintiff owned was her sepa-

rate paraphernal property which she acquired by inheritance from her deceased father; and Mrs. Louise Allen acquired the remaining half interest therein and subsequently sold same to J. D. Capron, as alleged in his answer.

The overseer on the plantation in controversy was introduced as a witness for the plaintiff, and his statement is, that he managed and superintended same for and during the years 1889 and 1890. That he was employed by J. D. Capron, who directed and controlled the whole plantation, disposed of the crops, employed the laborers, paid all plantation expenses, and his wages. That during the term of his employment, he received orders from no one else than Mr. J. D. Capron, and knew of no one else who set up any claim or pretension to the management or control thereof. That prior to his employment on the place he had lived in the neighborhood, and had been familiar with the place and knew when Mr. Capron went on the place and helped him to operate it for two or three weeks thereafter. He states that he is familiar with the transactions between Mr. Capron and D. C. McCan, and that subsequent thereto the former paid him his wages as overseer; and that soon after the mortgage was given to McCan, he received the sum of five hundred dollars which he (witness) had loaned him (Capron) and two months' salary. That the whole plantation "was cultivated as an entirety," and that whatever moneys were expended were for the whole plantation; and that neither the plaintiff nor her husband had any money except what they had borrowed to run the plantation with. That plaintiff had nothing whatever to do with the management of the plantation in 1890.

Another witness, who resides on the plantation adjoining that In dispute, corroborates the statement of the overseer, but from his observation only; and another witness, who states that he was acquainted with the place during the years 1889 and 1890, says Mr. Capron was superintending the plantation exclusively—that is the whole place—and never knew of the plaintiff exercising any control whatever; either personally or through her husband as agent for her.

As a witness the plaintiff states that the entire sum of ten thousand dollars that was borrowed from D. C. McCan "went for her husband's business." That she never handled any part of that money. That her husband had the exclusive management and control of the

plantation, and that she had nothing whatever to do with it, directly or indirectly.

Her statement in respect to the loan of ten thousand dollars by McCan is as follows, viz. :

"I gave the mortgage because my husband told me that it was absolutely necessary to his business, and, after discussing the matter for weeks, he told me that if I insisted on resisting that he would have to give up the plantation business and leave the plantation, and I knew that if he went into any other business that I would have to roam around everywhere with my little children, and for that reason, after thinking the matter over for a long time, I concluded to give the mortgage."

She states that when the checks were drawn by Mr. McCan she endorsed them and turned them over to her husband, nd that he used the money for plantation debts and expenses.

After having had exhibited to her the act of mortgage executed by her in favor of Thomas A. Laws & Co. before J. W. Lyman, notary, on the 20th of February, 1889, she says that the purpose of same was for her husband's business—to secure " advances on the plantation," and that the money which was borrowed from Mr. McCan was partly for the purpose of paying that indebtedness.

It is striking that throughout the entire course of the plaintiff's testimony it is nowhere stated that there was ever *any* negotiations or interviews between herself and D. C. McCan, or any person representing him, with regard to borrowing of him ten thousand dollars, or any other sum, during the year 1890; or with regard to the execution of a ten thousand dollar mortgage in his favor on his property.

Louis P. DeBoutte, as a witness, states that he " accompanied Mr. Capron at about the date (of the act of mortgage) to the office of Mr. McCan, for the purpose of introducing him to Mr. McCan. That he . then informed Mr. McCan that Mr. Capron was an applicant for a loan and would himself explain matters therewith connected. That he simply heard Mr. Capron apply for a loan of eighteen thousand dollars, to be secured by a mortgage upon a sugar plantation owned by himself and wife. That Mr. Capron himself asked for a loan and offered the place owned by himself and wife as security.   *   *   * That he does not recollect Mr. Capron telling Mr. McCan that he was managing the place for either himself or his wife, and do not think the question was asked whilst he was within hearing. Mr. McCan

asked Mr. Capron who owned the plantation (and) he replied that
he and wife owned it.    Mr. McCan asked what, if any, debts
existed against the plantation, and Mr. Capron replied there was a
debt of eight thousand dollars recorded against it.    Mr. McCan
asked if the place owed *other debts, and Capron replied about three
thousand dollars due to his commission merchant.*    Mr. McCan then
replied that he would investigate, and if everything was all right
he thought he would make the loan.

" *Mr. Capron told Mr. McCan that a debt of three thousand dollars
was to be paid out of the loan to his commission merchant.    *   *   *
Mr. McCan was informed that the balance of the money was to be used
in cultivating the crop.*"

The statement of Andrew Hero, Jr., the notary before whom the
plaintiff executed the ten thousand dollar mortgage in favor of
McCan, is, that " in the beginning of February, 1890, J. D. Capron
called at his office and stated that he had heard that he attended to
making loans for D. C. McCan and desired to know if he could secure
a loan for twenty thousand dollars on his or the Berwick plantation.
That he told him that he preferred that parties should deal personally
with Mr. McCan, and to call on him.    The next day, or a few days
afterward, Capron and McCan called at his office and the subject of the
mortgage was discussed *before and with him.    McCan looked to him to
protect his interests in* the execution of the mortgage, and if he was not
satisfied he could decline them. That he learned that one-half of the
plantation belonged to J. D. Capron, whereon there was an existing
vendor's mortgage of eight thousand dollars, and that the other half
of the place belonged to his wife, Mary Capron, which was subject to
a mortgage of four thousand dollars (and) that the holders were
pressing for payment."

That he then advised, and McCan accepted, the plan as it was
consummated.

He states, however, that " Mr. Capron demurred to the reduction
(to eighteen thousand dollars), insisting that full twenty thousand
was needed, but McCan would not yield and finally Capron agreed
to the terms that McCan insisted upon.    Afterward the necessary
papers were produced, and the transaction was consummated in the
words above stated."

He states that nothing was said at the time the act of mortgage
was prepared about the pledge of the crop.    That " *acting as Mr.*

*McCan's adviser and notary*, he considered that the certificate of the judge to borrow the stated amount of ten thousand dollars, and secure its payment by mortgage, was all that was necessary, and the acceptance of less security, by only mortgaging the real estate, did not impair the force of the certificate nor the validity of the mortgage to be executed. That he said nothing to Mr. McCan or Capron *of such omission of such pledge of crop, as McCan left it to his option as to the papers presented to him, and the proper execution of his mortgages;* and neither he, McCan, nor J. D. Capron, nor his wife, Mary Capron, said that any crops were to be pledged as security. That if such pledge had been suggested he would have recollected it and put it in the mortgage, but it was an outright, flat loan of ten thousand dollars on Mrs. Capron's half of the plantation, additionally secured by her husband mortgaging his half of the plantation, and no reference or conversation had with or before me as to any pledge to be made or given of the crop of the plantation by either McCan or Capron."

It thus appears that this witness confesses that in this entire transaction he not only acted as officiating notary but assumed the role of sponsor and adviser of McCan; and, with the certificate of the judge before him containing the plain recital that the money the plaintiff proposed borrowing from his client, McCan, was " for her own use and the benefit of her separate estate, and not for the benefit of her said husband, or the payment of his debts, nor those of the community, and that same was to be secured by a mortgage on her paraphernal property, and also a lien, privilege and pledge of the crops to be grown on her said property during the year 1890," he deliberately advised McCan to pursue an exactly opposite course, and McCan followed his advice, and acted as he directed him to do.

Not only so, but he professes that nothing was said by either of the parties in his presence with regard to the act containing the stipulation of a pledge upon the crops to be thereafter grown upon the property, whereas he had before him the petition of the plaintiff, on the faith of which the judge had granted the certificate, and which petition contains the recital, that she desires to borrow ten thousand dollars for the cultivation and working of her plantation, in order to procure necessary supplies and to pay the necessary expenses of its cultivation; and which further recites that McCan " required of her a special mortgage on her aforesaid *property, and a factor's lien and privilege on all the crops*

*and products of the aforesaid property this current year (1890),"* and that she prays for the judge's authorization to that effect.

And this witness further states that he "understood that part of (the money loaned) was to be used in settlement, or payment of the mortgage of four thousand dollars *that Mrs. Mary Capron owed on her half of* the plantation; and I only came to know this because this mortgage was specified in the certificate of mortgages produced for annexation to the act. As to what use the balance was put, I know not."

It is of importance to ascertain the contents and purport of the mortgage which the plaintiff had executed in favor of James H. Laws & Co., on the 20th of February, 1889, which was recorded against her property, and mention of which was made in the mortgage certificate to which the witness, Hero, refers.

The pertinent stipulations of same are as follows, to-wit: "And the said James D. Capron is the lessee of the other undivided one-half of said plantation, which said plantation the said appearers are working and cultivating during the current year, for the purpose of growing and gathering thereon crops of corn and sugar cane, and manufacturing from the latter a crop of sugar and molasses, and being in want of ready funds for said purpose, and requiring advances in money and supplies to feed and pay the laborers and other employees on the said plantation, to maintain the live stock thereon, and to defray all other necessary expenses, they have applied to said James H. Laws & Co. to make the requisite advances and which they hereby agree to do on the following terms," etc. * * * "That in addition to the said lien and privilege, the said Mr. and Mrs. Capron do hereby grant and consent in their favor a pledge of the crops," etc. * * * "That the said plantation shall be cultivated to the best advantage by the said owner and lessee, so as to produce therefrom a crop of sugar and molasses, the whole of which they hereby bind themselves to ship and consign to said Jas. H. Laws & Co.," etc. "And the said appearers having bound themselves to all the foregoing terms, conditions and stipulations, the said Mrs. Capron has, in liquidation of said advances and to facilitate the said Jas. H. Laws & Co. in the transaction of said business, made and subscribed to her own order, and has endorsed three promissory notes," etc. * * * "Now in order to secure the full and punctual payment of said notes," etc., "the said Mrs. Mary Berwick

Capron does by these presents specially mortgage her paraphernal property."

There can be no question of the fact that that act bears upon its face indubitable proof that the plantation was operated and culti- vated in 1889 upon the joint account of the plaintiff and her husband, and constituted the debt to Laws & Co. an indebtedness of the com- munity and of her husband personally.

The law emphatically declares that if, in the course of the wife's examination by the judge he shall ascertain that either the money to be borrowed or debt contracted is for her husband's "debts, or are for her separate benefit and advantage, or the benefit of his sep- arate estate, or of the community, he shall not give his sanction authorizing the wife," etc. (R. C. C. 127) ; and it further declares that the judge's "certificate, on presentation to the notary, *shall be his authority for drawing the act* of mortgage." *Id.* 128.

Consequently the notary acted in direct disobedience to the pro- visions of the law governing his duties in preparing the act as he did, as well as in disregard of the specific terms of the plaintiff's application and that of the judge's certificate; and being confessedly the adviser of McCan in the premises, the latter became likewise responsible for the disregard of same.

In addition to the foregoing details of the transaction from the lips of the living participants therein, there are many of minor importance which point with unerring certainty in the same direc- tion.

For instance, the correspondence between the parties, their agents and attorneys, with regard to the loan, the execution of the mortgage, the extension of the notes at maturity, the demand for the payment of the fees of a lawyer for making an examinationof title; and finally the demand for the payment of the ten thousand dollar mort- gage notes which brought about the settlement and change in the *form* of the titles of the property in 1893 and the execution of the notes which constitute the foundation of this suit.

In not one of these does the name of the plaintiff figure *except to sign her name to the acts* which were necessary for their consumma- tion; and there is nothing in the evidence to. contradict or impeach the statements of the witnesses and the recitals of the acts which we have quoted.

Not only so, but the radical errors complained of are those of law,

and they are plainly apparent from a simple inspection of the plaintiff's application for the judge's authorization, the judge's certificate of authorization and the act of mortgage; and the cause or consideration of the notes of the plaintiff were most distinctly brought home to McCan during the negotiations which led up to the agreement and in its consummation, and same is fully confirmed by the recitals of the Laws & Co. mortgage, which was extant and duly recorded at the time.

The subsequent transactions in 1893 were purely formal, and merely intended to *divest* the title of the plaintiff and *invest* her husband with title.    There was no consideration passing from McCan to the *former*, but the surrender of the ten thousand dollar mortgage notes; and none to McCan from the *latter* but the execution of new notes.

The negotiations preceding the transactions foreshadowed the result that was to be accomplished.   McCan at no time ceased to be a mortgage creditor, first of plaintiff, and then of her husband; and the property was disencumbered of the mortgage of the former, but to have same immediately replaced by one of the latter.   The scheme was intended to have the effect of a sale of the wife's separate and paraphernal property to her husband, in direct violation of the express prohibition of the law (R. C. C. 2446) ;  or if it be given the effect of a security, simply, then it was in violation of R. C. C. 2398.

But it is seriously contended on the part of the executory creditor, that he was not aware of any of the secret equities which existed between McCan and the plaintiff with reference to the original transaction, and that he dealt with J. D. Capron on the faith of his personal inspection of and acquaintance with the public records, upon which no apparent defects were stamped.

But, quite to the contrary, it appears conspicuously from the transcript, that the records upon which he placed reliance did disclose radical and incurable defects;  and they further show that, not only was he aware of the nature and origin of the original contract, but that when he was approached by the plaintiff's husband with the view of getting him to take up and extend the ten thousand dollar mortgage notes which McCan held, he made the objection that he did not regard the proposed investment a safe one on account of the

joint ownership of husband and wife, and their joint management and control of the plantation.

Further, that the arrangement consummated was the identical one he proposed, and in the consummation of which McCan, J. D. Capron and he co-operated; but that the plaintiff was conspicuously absent, except in the single circumstance of signing her name to the acts, at the instigation of her husband.

But the original notes were surrendered, and have been destroyed. Mrs. Capron's separate property passed into the hands of her husband, and the defendant received *his* notes with such a mortgage only as he had power to create thereon.

It is evident from the character of the dealings and transactions of the parties that they did not have the legal effect of passing a valid title from the plaintiff to her husband, and the necessary consequence is, that the husband had no power to create a mortgage on the half interest of the wife thus illegally alienated, which the seizing creditor can enforce.

The act of 1855 has been frequently interpreted to place upon a married woman the burden of proving "that she is not bound fo some legal reason;" but that the mortgage and certificate of the judge constitute no estoppel against her showing "that she received no money, as stated, in the mortgage, and that the real consideration for her note was an antecedent debt of her husband." Barth vs. Kasa, 30 An. 940; Rice vs. Alexander, 15 An. 54; Bank vs. Barrow, 21 An. 396.

Accepting this theory she has attempted by the introduction of parol and written evidence *dehors* the act of mortgage, as well as by the recitals of her petition, the judge's certificate, and the act of mortgage, to discharge that burden; and I am of the opinion, in the light of the authorities, that she has done so.

All of the decisions of this court unite in holding that the act of 1855 makes the petition of the applicant, and the judge's certificate of authorization control the subsequent act of mortgage, and render same null and void *ab initio* for any substantial or material variation therefrom.

In Falconer vs. Stapleton, 24 An. 89, it was held that the authorization of the judge under the act of 1855 must be given *before* the debt is contracted, or the mortgage is given.

In Conrad vs. LeBlanc, 29 An. 123, it was held that a wife's

authorized mortgage for a certain sum was bad, because the certificate authorized the loan for the purpose of "obtaining supplies to carry on her farming interest *for the present year*, and the act of mortgage secured a loan to enable her to pay her *past indebtedness*," the debt to be provided for preceding in date the date of the judge's certificate.

In Gibson vs. Hitchcock, 37 An. 209, it was held to have been a fact disclosed by the documentary evidence in the record that "the money alleged to have been loaned was not and could not (have been) used for the object described in the application for authorization to contract, and in the judge's certificate;" and the conclusion of the court on that statement was that "if the evidence shows that the contract was not based on the object stated in the judge's certificate, but for a different object to the knowledge of the creditor, the burden of proof that the contract enured to the benefit of the wife is thus shifted on the creditor seeking to enforce the contract."

In Claverie vs. Gerodias, 30 An. 291, it was held that in the hands of a creditor who knowingly accepted a wife's unauthorized mortgage as security for her husband's debt, same is utterly null and void. Barth vs. Bond; Manning's Unreported Cases, 431.

In Stapleton vs. Butterfield, 34 An. 822, it was held that the mortgage of the wife having been given to secure the debt of her husband and her own *past* indebtedness, the mortgage and sale of the plaintiff's property are both nullities.

The authorities are uniform and tend in the same direction.

The case of Henry vs. Gauthreaux, 32 An. 1103, is *sui generis*, and exceptional, in that the opinion stated that "it is indisputable that the two notes referred to were issued by the plaintiff in the capacity of a *single* woman, she representing herself expressly in the act of mortgage as an *unmarried* person," and upon this statement the court say "it is therefore palpable that the plaintiff, while a married person, twice falsely represented herself as a *femme sole*, and upon such fraudulent pretence obtained from a third party the loan of a sum of money which was paid her."

The opinion does not in any manner affect or impair the general principles announced in other cases.

My conclusion is that the plaintiff has made good her claim to relief, and that her injunction should be maintained and perpetuated, and her title and possession recognized and maintained.